GEORGIA PRIEST, APPELLANT, v. BUSINESS MEN'S PROTECTIVE ASSOCIATION, APPELLEE.

FILED JUNE 13, 1928. No. 26105.

*Allen & Requartte,* for appellant.

*Good, Richardson & Good, contra.*

Heard before GOSS, C. J., ROSE, DEAN, GOOD, THOMPSON and EBERLY, JJ., and REDICK, District Judge.

REDICK, District Judge.

This is a proceeding under the workmen's compensation act to recover compensation for the death of Barney B. Priest, initiated by his wife, Georgia Priest. The claimant will be referred to as the plaintiff, and the employer as the defendant. Compensation was allowed by the commissioner at $15 a week for 350 weeks, and defendant appealed to the district court, where the award was set aside and judgment entered in favor of defendant. Plaintiff appeals to this court.

The plaintiff claims and alleges that the deceased, who was her husband, was an employee of defendant and died as the result of an accident arising out of and in the course of such employment, on March 15, 1926.

The defendant denies these allegations, and claims and alleges that at the time of his death said Barney B. Priest was manager for defendant of the state of South Dakota and was an independent contractor.

It will be necessary to state somewhat in detail the facts as disclosed by the record and about which there is not much dispute, but as to the proper inferences to be drawn from those facts the parties are in wide disagreement. From the evidence offered by plaintiff it appears that Priest first became connected with defendant about May 1, 1924, the nature of which connection being evidenced by a contract in writing excuted a few months later. The contract appointed Priest as "special agent to solicit desirable risks for health and accident insurance" for the association. Certain commissions were provided, together with bonus

commission of 50 cents per application. The contract then provided:

"It is further agreed that the party of the first part agrees to give the party of the second part an opportunity to take charge and become state manager of the first state opened after July 1, 1925, and commission and consideration for handling said state to be agreed upon after the party of the first part becomes admitted. In the event the party of the second part does not want to take charge of the first state opened it is further agreed that he shall have the first privilege of any state opened so long as this contract is in force and effect, until he gets a state that is desirous to him.

"It is further agreed that party of the first part will pay party of the second part one hundred dollars per month flat as traveling expenses so long as he remains with the association.

"The party of the second part shall have authority to appoint his agents to work under him for the party of the first part, and shall receive as an overwriting commission the difference between the commission paid the subagent and the commission stated in this contract."

The contract then provided that, in case the association was converted into a stock company, Priest should receive $5,000 of stock, and contained a provision for cancelation by either party upon 60 days' written notice, and a provision that Priest was to remit in cash all nets to the association with the applications.

July 5, 1924, defendant wrote Priest a letter insisting upon his putting in all his time for the company, at least eight hours a day, and forbidding him to sell any other kind of insurance or represent any other company.

Witness O'Sullivan, secretary of the company, testified as to the relations of the parties and the manner of conducting the business during a period ending January 5, 1925, when the witness left the employ of the company. His testimony was to the effect that Priest was under the control of the company, who designated the places where

he was to go and the work he was to do, and that he was under the direction of the office at all times, but that he had no right to reject applications or cancel policies, and that, as usual in such cases, the terms of the policies, premiums, the right to reject applications and to cancel licenses of agents was with the company. Plaintiff also offered in evidence a copy of the "Monthly News" of the defendant company for April, 1926, containing an account of Priest's death, and closing with the statement: "On January 1, 1926, Barney was appointed state manager of the state of South Dakota, and it was in the development of that state that he was killed. Salesmen will come and go, but it will be a long time bofore the B. M. P. A. will have in its ranks another one like B. B. Priest."

Much of the evidence offered by defendant was objected to as incompetent, and it therefore seems proper to consider it in two divisions, and, first, that which is concededly competent. It appears that at least up to the 1st day of January, 1925, Priest was operating under the contract above referred to exclusively in the state of Nebraska; and about that date, or late in 1924, the company obtained permission to do business in the state of Kansas. About the same time Priest expressed dissatisfaction over the fact that he was not receiving as large commissions as one Minor, another agent of the company, who testified to the fact and that they talked to Moreland, president of the company, about Priest going into Kansas. This was in January, 1925, and shortly thereafter Priest did go to Kansas, and on March 15, 1925, wrote Moreland: "Will send you cash on all business from now on as I think I am even for the month you promised me that $300 and expenses." He had previously, February 12, 1925, written from Kansas City, Kansas, asking them to send his salary check. May 15, 1925, he wrote from Atchison, Kansas, saying: "Just as soon as it quits raining I am coming to Lincoln and get routed in some part of Nebraska or Kansas where I can make a living." Priest remained in Kansas about two months and returned to Nebraska, carrying on his work

there as before (whether under the contract or a new arrangement uncertain) until early in February, 1926, when he went to South Dakota. He was delayed on account of lack of funds and disposition or sale of his renewals. On January 16, 1926, he wrote Moreland saying he could not get away before a week and to send "that $150 as I want to get all my little bills paid up before I leave." And on January 19, 1926, he again asked for the $150 so he could get to South Dakota, and on January 30 again expressed his anxiety to get to South Dakota, and saying he wanted to get all lined up before he started and to "start with a clean slate." January 26, 1926, Priest received from defendant a check for $100 and on the same day executed his note to defendant for $345, and on February 23, 1926, a note for $100.

The complete account between Priest and the company from September 1, 1924, to March 1, 1926, from the books of the company, appears in evidence, together with some items added subsequent to his death. These will be referred to later. The account contains no entry on the credit side of the $100 a month expense money referred to in the contract, nor the $300 a month salary while he was in Kansas, and charges Priest with the amounts collected by him for premiums upon policies and other items, and shows a balance due from Priest to the company on March 1, 1926, of $1,302.90. This is apparently accounted for from the failure of Priest to make remittances with his reports. It appears from Priest's letters that he was in the habit of retaining the premiums collected to pay his traveling expenses, and he did this with $300 salary in Kansas, resulting in an indebtednes to the company. After Priest's death two items aggregating $12.90 were added to the debit side; August 16, 1926, a credit, called "adjustment," of $935.01, which left a balance due on the account of $380.79. There may be some doubt as to the competency of Moreland and Schmidt to identify the books of account (*Martin v. Scott,* 12 Neb. 42) ; but no specific objection was made on that score, nor to the accounts for want of proper foundation.

They may be omitted from consideration, being referred to only as explanatory of the transaction between Moreland and plaintiff now to be mentioned. Moreland testified that in August, 1926, he and the plaintiff went over the account of Priest with the company, and the balance above mentioned was agreed upon and a copy of the account given Mrs. Priest and the bookkeeper instructed to give plaintiff the two notes above mentioned, the same having been credited to the account, and Mrs. Priest promised to pay the balance of $380. This evidence is not disputed by Mrs. Priest. In explaining the items of the account, Moreland testified that the $800 salary to January 1, 1925, and $300 salary for a month Priest was in Kansas were included in the adjustment item of $935.01, and the $345 note.

Depositions of several witnesses were taken in South Dakota to the effect that while Priest was up there in March he was looking for agents to undertake the sale of policies in defendant company under him, telling them he was manager in South Dakota. From the evidence of these witnesses this is the work upon which he was engaged while on the trip upon which he met his death. It also appears that he solicited insurance on his last trip. The evidence does not disclose any transactions with the home office originating in South Dakota, nor any communications of any kind between Priest and the company, except a letter of March 11, 1926, in which Priest asked some instructions as to how certain printed supplies connected with the new agency were to be used, and the reply thereto expressing pleasure that he had "finally reached the goal." It should be here noted that the letters of Priest were competent evidence. They were objected to as being "transactions with a deceased person;" but such transactions are not themselves incompetent, only certain persons are not permitted to testify concerning them. True, some of the letters were identified by Moreland, who was incompetent to do so, but no objection was made at the time that no foundation had been laid for their introduction. If there had been, the requisite evidence would prob-

ably have been secured. However, they are sufficiently identified by a comparison with Priest's signature to letters introduced by plaintiff.

The above constitutes substantially all the evidence offered by either party, except evidence claimed to be incompetent as being offered by witnesses having a direct legal interest in the suit, and the plaintiff being the representative of the deceased party. The effect of this testimony may be briefly stated as tending to prove an abandonment by the parties of the written contract above referred to, and consists of conversations between Moreland and Priest in January, 1925, in which Priest expressed his dissatisfaction with his work, in Nebraska and wanted to go to Kansas, and resulting in an agreement that he should do so at a salary of $300 a month and expenses, to take effect January, 1925. He also testified to another conversation in May, 1925, in which Priest said he was not going to stay in Kansas, and witness told him he could come back in Nebraska and work under the same kind of contract that Minor had, which called for larger commissions than were provided in the written contract, but without any allowance for expenses, which Priest agreed to until the company entered South Dakota. Another conversation in January, 1926, in which they talked about the contract for South Dakota, witness telling him that he would get 80 per cent. commission on all quarterly business, 40 per cent. on all annual business and 5 per cent. on volume, that he should hire and discharge the men and pay them whatever commission he wanted to, not over what he himself was allowed, and whatever he could save to be his as an overwriting commission; that nothing was said in regard to salary; that Priest had not worked on salary since March, 1925; that he was under the impression a written contract for South Dakota had been drawn up, but was unable to find it, and none was ever signed; that the company, at Priest's request, advanced him $100 for his expenses in removing to South Dakota; that the company did not give Priest any instructions as to how he was to conduct the

business in South Dakota, but he was authorized to do so in his own way.

Another witness, whose testimony was objected to upon the same ground, was A. C. Schmidt, a director and assistant secretary of defendant company. He testified that he was present at the conversation in January, 1926, between Moreland and Priest regarding the South Dakota contract, and his testimony is to the same effect as that of Moreland.

Section 8836, Comp. St. 1922, provides: "No person having a direct legal interest in the result of any civil action or proceeding, when the adverse party is the representative of the deceased person, shall be permitted to testify to any transaction or conversation had between the deceased person and the witness."

The objection to the testimony of Moreland and Schmidt above detailed seems to be well taken. This testimony had to do with transactions and conversations with a deceased person, and the plaintiff is the representative under the provisions of the workmen's compensation act permitting the claim for compensation to be made by the widow, next of kin, or administrator of the estate. *Coster v. Thompson Hotel Co.*, 102 Neb. 585. The only difficulty we have had is upon the question whether or not Moreland and Schmidt have a direct legal interest in the result of the suit. The defendant is a mutual assessment company, and debts and claims against it can only be met by assessment of the members. The by-laws provide that, if the regular assessment be insufficient for payment of claims and expenses, the directors shall have power to order further assessments, apportioned at the legal rate, and the statute requires assessments to be made to pay all losses, and upon failure to do so the officers to become individually liable therefor. Comp. St. 1922, secs. 7861-7866. The by-laws require the officers and directors to be members of the association, and therefore it may be assumed that Moreland and Schmidt were such members. It seems clear that, if the claim of plaintiff is allowed, members of the associa-

tion would be subject to an assessment for its payment and thus have a direct interest in the result. It is argued that for all that appears in the record the company may have sufficient reserve to pay the claim, and that therefore the liability to assessment is so remote as to not constitute that direct legal interest referred to in the statute, but we think the liability of the witnesses is sufficient to disqualify them.

In support of his contention that the evidence is competent, counsel for defendant cite the case of *Bost v. Supreme Council,* 87 Minn. 417, in which it was held that one Gilbert, who was a member of the fraternal association was competent as a witness as to conversations had with the insured, under a statute prohibiting all persons interested in the event of suit from testifying, and is directly in point for the defendant. It may be remarked in passing that the subject of such holding was not referred to in the syllabus. The judge writing the opinion referred to *Perine v. Grand Lodge, A. O. U. W.,* 48 Minn. 82, as sustaining the holding. Upon examining that case it will be found that the witness whose testimony was held competent was not a member of the society at the time of the death of the assured, and at the time of giving his evidence was a member of a subordinate lodge, and the testimony was insufficient to establish, with reasonable certainty, that he would be subject to an assessment to pay any judgment which might be recovered; and the writer of the opinion closed by saying: "Had it appeared that a recovery in this action would directly and certainly subject St. Cyr (the witness) to an assessment of any amount, either by the grand lodge or by the subordinate lodge, he would undoubtedly have an interest in the event of the suit, within the meaning of the statute." It therefore appears that the *Perine* case referred to in the *Bost* case makes for the plaintiff.

The only other case referred to in that connection was *Marvin v. Dutcher,* 26 Minn. 391, to the effect that the disqualifying interest must be such that the witness having

it will either gain or lose by the direct legal operation of the judgment therein, or may be prejudiced in some right by the use of the judgment against himself in some other action or proceeding, which is a substantial statement of the rule existing in this state.

The *Bost* case, however, was followed in *Havlicek v. Western Bohemian Fraternal Ass'n,* 138 Minn. 62, holding that the financial secretary of the local lodge was not an incompetent witness as to transactions with deceased, and also citing *Perine v. Grand Lodge, A. O. U. W.,* 48 Minn. 82, and distinguishing *Peterson v. Merchants Elevator Co.,* 111 Minn. 105, holding that a stockholder of a corporation was so directly interested that he could not testify. These decisions are not convincing.

Appellee also cites *State Bank of Dexter v. Fairholm,* 201 Ia. 1094, holding that neither the president nor cashier of a bank were incompetent to testify as to transactions with the husband or to conversations with him relating to execution of the note in suit by reason of the witness' connection with the plaintiff bank, basing their holding upon the fact that the statute did not exclude the agent of a company from testifying. Moreover section 4604 of the Code of Iowa excluded only parties to the action, which sufficiently accounts for the holding.

On the other hand, in consonance with the general holding, it was held in *Tecumseh Nat. Bank v. Magee,* 61 Neb. 709, and in *Dickenson v. Columbus State Bank,* 71 Neb. 260, that a stockholder in a corporation has such a direct legal interest as to render him incompetent under the statute, in an action in which the corporation was interested. In *Tecumseh Nat. Bank v. Magee, supra,* the test for the determination of the interest of the witness was whether he would gain or lose by the direct operation and effect of the judgment, or whether the judgment would be competent evidence for or against the witness in another action. In either event his interest was such as to disqualify him.

Tested by these rules, it would seem reasonably clear that Moreland and Schmidt were incompetent under the statute to testify to transactions and conversations with Priest. Being officers of the association it will be assumed, in the absence of evidence to the contrary, that they were members thereof and, under the by-laws of the association and the statutes of the state referred to, would be subject to assessment if it were necessary to pay a judgment in this proceeding. It is argued, however, that it is not shown but that the reserve of the association would be sufficient to satisfy the judgment. There is no evidence upon the point, but we do not think that the contingency renders the interest of the witnesses so remote as to render them competent. The reasons for excluding a stockholder of a corporation are of equal cogency when applied to the member of an assessment association. Upon the dissolution of either body the members would have an interest in the distribution of its assets and therefore are alike interested in any proceeding whereby they might be depleted. We think the depletion of the assets or the levying of assessments may be considered as resulting from the direct operation of the judgment. In proceedings to collect the judgment the members could not contest the existence of the indebtedness, and therefore the judgment would be evidence against them. They were interested in preventing the recovery of the judgment and therefore disqualified from testifying to transactions with decedent against his representative. The instant case, when submitted to the tests laid down in *Tecumseh Nat. Bank v. Magee, supra,* seems to fulfill them.

In *Cronin v. Supreme Council of the Royal League,* 199 Ill. 228, it was held that a member of a beneficiary association was within the disqualifying statute.

The question remains whether or not, excluding the incompetent testimony of Moreland and Schmidt, plaintiff has produced sufficient evidence to sustain a finding that at the time of his death Priest was an employee of defendant.

It has been frequently said, that the basis underlying compensation statutes is the proposition that the industry in which the claimant is employed should bear the loss of his injury or death growing out of and in the course of his employment. If we can discover in what industry Priest was engaged at the time of his death we will have found the party liable for the compensation provided by statute.

The evidence is not conclusive upon the question. The plaintiff claims that by the written contract in evidence Priest became an employee of the defendant (we do not decide the point), and that in the absence of competent evidence of a change in their relations, the same continued to the time of his death. This may be conceded, but the defendant claims that the presumption is destroyed by the subsequent conduct of the parties, showing, as is claimed, that when Priest went to South Dakota he became an independent contractor engaged in a business of his own. The facts tending to show such change of relations and an abandonment of the written contract are, that Priest changed his place of work from Nebraska to Kansas at a fixed salary of $300 a month and expenses, in about February, 1925; that upon his return to Nebraska he worked under a contract substantially the same as that of Minor, and not under the written contract, and later, about January 1, 1926, was appointed state agent for South Dakota, as contemplated by the terms of the written contract, his compensation to be agreed upon. There is no competent evidence that any agreement was ever concluded as to his compensation as state manager.

As further evidence of abandonment of the written contract, defendant points to the giving by Priest of the note for $345 on January 26, 1926, the advance to Priest on that day of $100, which Priest refers to as $150, to enable him to go to South Dakota, and Priest's note for $100 dated February 23, 1926. It is important to note in this connection that the contract under which Priest began his connection with defendant provided that "he shall have the

first privilege of any state opened so long as this contract is in force and effect, until he gets a state that is desirous to him," indicating an understanding that in that event the contract should end and a new one be entered into as provided for therein.

It further appears that. while in South Dakota Priest was engaged in activities properly looking toward the establishment of an insurance agency of which he would be the head in that state.

We think it must be conceded that the management of an insurance agency which employs subagents for soliciting insurance of various kinds and for a number of companies may be considered as an industry in itself, enjoying the privileges and bearing the burdens of the workmen's compensation act; and that such industry may be established though the business is confined to writing insurance for one company. Persons engaged in that industry are in no sense employees of the insurance companies represented by them. Such agencies are numerous and well known to the business world. It has not been brought to our attention that a claim was ever made that agents in that business were employees of the single or several companies they represent, and the plaintiff in this case makes no such claim. In *Christensen v. Protector Sales Co.*, 105 Neb. 389, Christensen "undertook to sell defendant's products to the retail trade on a commission basis." He was assigned a territory, given an advancement, furnished with samples and advertising matter, took two orders for merchandise, and on the second day was accidentally killed while traveling by automobile in his territory. Defendant had other salesmen working under a similar agreement, each assigned to separate territory. We held that a finding that plaintiff was an independent contractor was sustained by sufficient evidence, Morrissey, C. J., remarking:

"The relationship existing between these parties may be likened to that between insurance solicitors and their companies. When day dawns the agent is free to work or play. If he idles away the day, he does so at his own loss. The

company has the right only to revoke the agency agreement. Christensen was free to make his sales by writing letters to the dealers within his territory; he might have called them by telephone, or he might have employed sub-agents."

Was Priest such an agent at the time of his death? The question is by no means free from difficulty; in fact, we have found it a very perplexing one. Upon a critical examination of the competent evidence in the record, we have reached the conclusion that the reasonable view to take of the situation is that at least on January 1, 1926, Priest ceased to be an employee of defendant and entered upon an independent career as owner and manager of an insurance agency in South Dakota, under the appointment of defendant, but not subject to defendant's control as to the manner in which such agency should be conducted, where, in the state, it should be established, nor under any superintendence or supervision of defendant, such as is present in the relation of employer and employee; that Priest was engaged in a separate industry and his relation to defendant was that of independent contractor. We are at least convinced that the plaintiff has failed to establish by sufficient evidence that Priest was an employee of defendant at the time of his death, and that the finding that he was an independent contractor is sustained by sufficient evidence. It follows that the judgment of the district court is right, and it is                                         AFFIRMED.